IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 13-CR-30091-MJR |
| | ) |
| BRIAN MATTHEWS, | ) |
| | ) |
| Defendant. | ) |

**DEFENDANT'S SENTENCING MEMORANDUM**

**I. Introduction**

On June 26, 2014, Brian Matthews (Brian) will be sentenced by this Honorable Court. Brian has spent most of his life living in the East St. Louis, Illinois area. In April of 2013, although he was under-employed, Brian enjoyed a decent life. Desperate to make ends meet, Brian allowed the promise of $2,000 of which he was paid $500 to put his decent life in shambles. Because of this decision, the best sentence Brian can hope for on June 26, 2014 is 15 years.

**II. Court's Sentencing Memorandum**

The undersigned reviewed the Sentencing Memorandum prepared by this Honorable Court as part of co-defendant Ward's sentencing. The Memorandum is devastatingly accurate and unfortunately, Brian fits squarely into a lot of the conclusions made by the Memorandum. Brian was born and bred in East St. Louis. He is a felon. His role in the offense was to be "security" for the 10 kilograms of cocaine to be stored at

1

an East St. Louis stash house. His role required that he have a gun to "protect" the shipment, thereby making him ineligible for the "safety valve."

In the undersigned's opinion, Orlando Ward's role was minor compared to the other co-conspirators, yet he received a 5 year sentence which appears harsh. Since no co-defendant other than Ward has been sentenced, and based on this Honorable Court's Ward Sentencing Memorandum, it is entirely possible that an above Guideline sentence might be given to Brian due to his history and characteristics as well as his participation in this offense.

The undersigned is hopeful that this Sentencing Memorandum will sway this Honorable Court into *not* departing upward and to impose a 15 year sentence on June 26, 2014.

### III. Entrapment

The easiest thing for a criminal defense attorney to do in this case would be to criticize the Bureau of Alcohol, Tobacco, Firearms & Explosives (ATF) for "making a case up."

The reality is that each participant in this case, with the exception of co-defendant Orlando Ward was a dangerous person, who if given the opportunity would have harmed someone.

Due to the unique nature of this case, as well as the Seventh Circuit's opinion in *Mayfield* no legal argument could be made that any of the Defendants were entrapped by the Government's actions.

Similarly, from a common sense standpoint, no entrapment argument could be made. Throughout this investigation, Martez Moore oftentimes took the lead in discussing criminal activity and what he and the co-defendants were going to do. The agents went so far as to tell Moore *not* to exaggerate the amount of cocaine he could move once it was brought into the Southern District of Illinois.

In all candor, the ATF did a wonderful job investigating this case. The investigation began in the streets of East St. Louis on April 4, 2013 and concluded at the regional airport in Bethalto on May 7, 2013. It started with an undercover ATF agent meeting with a confidential informant who led the ATF to target co-defendant Moore who was active in the "Metros" street gang.

In its initial stage, "crack" cocaine was purchased numerous times from Moore and his surrogates. On April 11, 2013, as the quantities of "crack" cocaine purchases increased the undercover ATF agent began hinting that he was in fact from California and worked for a large drug cartel. The agent told Moore his work as an airline ramp agent permitted him to skirt airport security so that he could traffick narcotics for a large California drug cartel.

The ATF agent quickly dispatched using the confidential informant and began filling Moore's head with the promise of quick and easy money. When the prospect of stealing cocaine was broached, Moore ultimately decided that it would be more profitable to sell multi-kilo quantities of cocaine instead. As such beginning April 16, 2013 law enforcement began the elaborate hoax which concluded with the arrest on May 7, 2013 of the defendants.

At this point, the case became like a Hollywood movie script. Scenes directly out of *American Hustle* were played out in the Southern District of Illinois.

Ruse law enforcement activity was provided at the weekly Violent Crime Task Force meeting a few days before the 10 kilo shipment was supposed to be sent, in order to ascertain if Ward would tip-off Moore.

Aerial surveillance from an Illinois State Police airplane was used to follow Moore so he would not be aware of mobile surveillance. On April 19, 2013 two ATF agents "flew in from Los Angeles" to meet Moore. These two agents arrived at the Cahokia airport and one acted as if he was unable to speak English so the other agent acted as an interpreter. Moore indicated he could distribute at least 5 kilograms of cocaine. This was also the first mention Moore made of a cousin (Ward) who worked for the East St. Louis police department.

On Tuesday, April 30, 2013, a sham delivery of 40 kilograms of cocaine was made. Moore was allowed to look at the faux cocaine and was duped into believing two female drivers had transported the sham cocaine from California to the tiny airport located in St. Jacob, Illinois. At least 9 ATF agents participated in making Moore believe that an actual drug transaction was going to occur on May 7, 2013, going so far as to fly an actual airplane into the St. Jacob airport hangar. At this point Moore agreed to the delivery of 10 kilograms of cocaine a week later.

## IV. Greed

Martez Moore is a cancer whose greed led to the other co-defendants becoming involved in this criminal endeavor. Moore's greed and deceit were evidenced by his

4

desire to keep his partners in the dark as to what he was going to pay for each kilo of cocaine. Moore wanted the ATF agent to make his partners believe he was paying $24,000 per kilo as opposed to $17,500 so that Moore could pocket the difference. Moore was even upset that Ward wanted such a large amount of money to provide information.

Moore had met with the ATF agent a total of three times before he became entwined in this conspiracy. Moore had sold less than 100 grams of "crack" to the undercover agent and greed made him believe that he could make the leap from mid-level drug dealer to a multi-kilo cocaine distributor who would act as the "hub" of cocaine distribution in the St. Louis area.

The best example of greed making good people do bad things is Orlando Ward who was a highly decorated and well-respected detective of the East St. Louis police department. Ward allowed the lure of easy money to twist him into a co-conspirator in a large scale drug conspiracy. The lure of easy money led Ward to do things he never would have thought of doing days earlier. The Orlando Ward respected by everyone in the legal community never would have tried to broker a 2-3 kilogram cocaine sale to be distributed by a truck driver friend.

Greed played a part in Brian's involvement as well. Brian was a union carpenter making about $30.00 an hour. In May of 2013 he had been laid off and was having trouble making ends meet. He was promised $2,000 to help guard the cocaine at Moore's stash house. He received a down payment of $500. For $500, Brian is now facing the reality of receiving, at best, on June 26, 2013 a fifteen year sentence.

### V. 3553(a) Considerations

It is the undersigned's hope that it will determine a 15 year sentence is appropriate based on Brian's relevant individual characteristics or other § 3553(a) factors. The §3553(a) sentencing considerations include:

(1) The nature and circumstances of the offense and the history and characteristics of the Defendant:

(2) the need for the sentence imposed-

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the Defendant; and
> (D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the advisory guideline range;

(5) any pertinent policy statements issued by the Sentencing Commission;

(6) the need to avoid any unwarranted sentencing disparities; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a) (2) also mandates the court to punish parsimoniously, that is, to impose a punishment "sufficient, but not greater than necessary" to accomplish the goals of sentencing.

### *Nature and Circumstances of The Offense*

Had there truly been a large scale California drug organization which was going to distribute multi-kilos of cocaine through Moore, the Southern District of Illinois would have been flooded with cocaine. Because Moore and his associates intended to "rock" the cocaine into "crack," the flood could have been a tidal wave.

The offense also included a law enforcement officer from East St. Louis who for $5,000 was going to run license plate numbers, conduct traffic stops, give advice on

where the stash house should be and who would apprise the co-conspirators of police activity in the area.

The quantity of cocaine which was going to be brought into East St. Louis required individuals to protect it from being stolen. Brian was one of those individuals. Throughout the investigation, Moore assured the ATF agent that he would find people unafraid to use violence to protect the drugs. At a meeting with the ATF agent, Brian was not bashful about describing his duties and showed an understanding for the role he would play.

The undersigned understands this Honorable Court's position as set out in its Ward Sentencing Memorandum. Hopefully, the fact that there was never any cocaine to be delivered will somehow inure to Brian's benefit.

In the 2002 movie *Minority Report*, crime was eradicated through the use of psychics who helped police catch criminals before they are able to commit a crime. Here, greed and stupidity were used in order to stop Moore and his co-conspirators from actually receiving and distributing large quantities of cocaine. The ATF's ruse drug transaction brought out the "worst" side of each co-conspirator.

In the end, Ward for example was nothing more than a blowhard. A savvy computer "geek" could get most of the information Ward provided. The fact that Ward "knew" important people in law enforcement is akin to a Cardinal batboy bragging that he knows Matt Holliday. Ward ran one license plate and never tipped Moore or the ATF agent off about supposed police activity in East St. Louis on May 3, May 6, or May 7. In reality, the sum and substance of what Ward did was to make a telephone call on May 3, 2013 giving the "all clear" for delivery on May 7, 2013.

In order to receive the $2,000 to be part of the conspiracy, Brian was required to carry a firearm to protect the 10 kilo cocaine shipment. When Brian met with the ATF agent on April 24, 2013 he acknowledged he would have a gun with him when the cocaine shipment arrived.

If Brian did not possess a firearm on May 7, 2013 he would be "safety valve" eligible and not be "guilty" of Count II.  His Advisory Guideline sentence would be miniscule compared to the 15 years he will hopefully receive on June 26, 2014.

### *History and Characteristics of Brian*

In his youth, Brian ran with the wrong crowd.  He has not had a real brush with the law in nearly 25 years.

While growing up in Edgemont, Brian enjoyed a nice, middle class lifestyle.  His nuclear family was intact.  His father was a hardworking man who came home every night to a loving wife and children.  Brian attended church on Sundays and went on family outings to Six Flags.

Once released from the Department of Corrections, for the most part, Brian stayed out of trouble.  In 2006 he was fortunate to become a member of Laborers Local 100 in Caseyville where he was making about $30.00 an hour, which is significant.

While incarcerated he became a member of the Metro street gang.  Brian did not join the Metro street gang per se --- the fact that he was from East St. Louis and was incarcerated in the Illinois Department of Corrections automatically made him a member.  It is virtually impossible to quit being a member of the Metros, and Brian did not cut his ties with them 100% which is how he knew Moore in the first place.

Hopefully, Brian's misguided youth will be greatly outweighed by what he has done with his life in the over 2 decades that have elapsed that he worked to be a productive member of society.

Greed no doubt played a part in Brian's decision to join and help Moore.  Desperation also played a part in this. Brian is a proud man who enjoyed working and in order to make ends meet he made a decision that will haunt him for the rest of his life.

### *Just Punishment*

This Honorable Court's Ward Sentencing Memorandum clearly demonstrates that the tough "federal message" to lawbreakers is not cascading throughout the East St. Louis community as one would think.  Crime seems unabated.

A goal of 3553 is for the Sentencing Court to avoid sentencing disparities. In this case, there are two extremes. Moore is at the top of the pyramid. *All* of Moore's co-conspirators were duped by him to join in this criminal enterprise. The low man on the totem pole is Ward. In the middle are the other co-defendants.

For the most part, Brian has lived a law-abiding life. It seemed as if he had cleared most of the bumps in the road of life and was settling into the life of a middle aged man. During the past several years, Brian helped to take care of his Mom who is in ill health and aging rapidly.

The desperation he felt for not being able to provide for his family derailed him. He made bad choices and took the easy way out. His role in the offense was not substantial or critical. Had he said "no" to Moore, someone else certainly would have filled Brian's spot.

A 15 year sentence is substantially more than what Ward received. Because they are charged in the same conspiracy, it is important for this Honorable Court to consider Ward's sentence when deciding whether or not it is appropriate to depart upward when sentencing Brian on June 26, 2014. Brian was nowhere near the top of the conspiracy insofar as he had no decision making capabilities and did not recruit others to participate in the conspiracy. The best sentence this Honorable Court can impose on Brian is three times higher than Ward's which should negate the necessity of an upward departure.

*Specific Deterrence*

A 15 year sentence will serve as a deterrence to other similarly situated individuals and also protect the public from future crimes of Brian. No one could make any claim that a 15 year sentence means Brian somehow "got off." Hopefully, it will also soothe any concerns this Honorable Court has regarding the impact this crime has had on the East St. Louis community.

*VI. Conclusion*

A 15 year sentence meets all of the objectives of 18 USC 3553(a) while not being overly harsh. As such, Brian requests that this Honorable Court on June 26, 2014 not upwardly depart and sentence him to 15 years.

                                BRIAN MATTHEWS

                                STOBBS LAW OFFICES

BY:
                      /s/John D. Stobbs II
                      John D. Stobbs II, No. 06206358
                      Attorney for Defendant
                      307 Henry St. Suite 211
                      Alton, Illinois 62002
                      Telephone: (618)462-8484
                      FAX: (618)462-8585
                      Email: jds2@stobbslaw.com

## CERTIFICATE OF SERVICE

      I hereby certify that on <u>May 23, 2014</u>, a copy of the attached *Defendant's Sentencing Memorandum* was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the following:

Ms. Kit R. Morrissey<br>
Assistant U.S. Attorney<br>
Nine Executive Drive<br>
Fairview Heights, Illinois 62208

STOBBS LAW OFFICES

/s/ John D. Stobbs II
307 Henry St. Suite 211
Alton, Illinois 62002